[Cite as *State v. Alfrey*, 2023-Ohio-2004.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2022-CA-51 |
| | : | |
| v. | : | Trial Court Case No. 21-CR-0731 |
| | : | |
| VICTOR ALFREY | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on June 16, 2023

. . . . . . . . . . .

ANDREW P. PICKERING, Attorney for Appellee

SAMANTHA L. BERKHOFER, Attorney for Appellant

. . . . . . . . . . . .

EPLEY, J.

**{¶ 1}** Defendant-Appellant Victor Alfrey (now deceased) appeals from his convictions in the Clark County Court of Common Pleas after a jury found him guilty of eight counts of rape (Counts 1-4, 7-10) and one count each of gross sexual imposition (GSI) (Count 11), abduction (Count 12), and endangering children (Count 13). He was sentenced to an aggregate prison term of 40 years to life. For the reasons that follow, the

judgment of the trial court will be affirmed as to all convictions except abduction; the conviction on the abduction count will be vacated.

## I.     Facts and Procedural History

{¶ 2} In June 2019, the victim, a girl who was then 11 or 12 years old began to live with Alfrey in Springfield at the Ronez Manor apartment complex. All seemed well for about a year, until Mother's Day – May 10, 2020 – when Alfrey began sexually abusing the girl ("the victim").

{¶ 3} Over the course of about 15 months, in three different locations, Alfrey forced the victim to engage in sexual conduct and sexual contact with him on numerous occasions. Finally, on the evening of August 29, 2021, after being beaten by Alfrey, the victim worked up the courage to tell her aunt what had transpired over the past year. She was taken to Springfield Regional Medical Center, where she spoke with officers, and then to Dayton Children's Hospital, where she was further evaluated. Staff at Dayton Children's Hospital photographed her injuries, did a sexual assault examination, and listened as the girl volunteered what had happened.

{¶ 4} When asked why she was at the hospital, the victim told Ronda Norris, a forensic nurse at Dayton Children's Hospital, that she was there "[b]ecause I told them that [Alfrey] had been doing sexual stuff to me since Mother's Day 2020." Trial Tr. at 154. The victim recounted that she had most recently been assaulted on August 28, 2021, when Alfrey put his penis in her vagina and anus and made her suck on his penis. Trial Tr. at 155-157. She explained to Norris that in May she had missed her period and Alfrey "told me I was pregnant and started punching me in the stomach real hard and I started

bleeding clots." Trial Tr. at 159.

{¶ 5} Norris also took photographs of the victim, who revealed that, only a few days before, she had been beaten by Alfrey; without prompting, she explained that marks on her neck were from where Alfrey had "choked" her, that injuries inside her mouth were from being punched by him, and that a bruise on her left breast was a hickey. Norris noted in her examination log that "[p]atient then looks at this nurse and says, 'I kind of feel bad for telling on [him], but I couldn't do this anymore.' " Trial Tr. at 164; State's Exhibit 64. "The patient says 'it went on for a year without me saying anything. I couldn't do it anymore.' " Trial Tr. at 164; State's Exhibit 64.

{¶ 6} In the early morning hours of August 30, 2021, Springfield police detective Kevin Miller was dispatched to Dayton Children's Hospital to investigate the reported sexual abuse. He interviewed Norris and the victim's aunt and watched a forensic interview with the victim. Based on what he learned, Detective Miller was able to secure a warrant to search Alfrey's home with a focus on the victim's bedroom. Officers used an alternative light source (blue light) with special glasses to see if any clothes in the room had bodily fluids on them. A sock, which was described in the victim's forensic interview, was collected.

{¶ 7} Eventually, Alfrey was arrested on other charges. This, however, gave Detective Miller the opportunity to interview him about the victim's allegations. After initially denying that he had had any inappropriate contact with the victim, Alfrey spoke forthrightly when Detective Miller mentioned the sock. "When I brought up the sock, I stated that we had found the sock consistent with what [the victim] had described; and at

that point in time, I noticed the body language change, and shortly thereafter he began * * * crying." Trial Tr. at 311; State's Exhibit 71 at 1:03. By the time the interview was completed, Alfrey had fundamentally admitted the allegations, although he blamed the victim, claiming that "she started everything." State's Exhibit 71 at 1:18.30.

{¶ 8} Based on what Detective Miller had learned, Alfrey was charged with:

| COUNT 1 | RAPE (child under 13) | R.C. 2907.02(A)(1)(b) |
|---------|----------------------|----------------------|
| COUNT 2 | RAPE (child under 13) | R.C. 2907.02(A)(1)(b) |
| COUNT 3 | RAPE (child under 13) | R.C. 2907.02(A)(1)(b) |
| COUNT 4 | RAPE (child under 13) | R.C. 2907.02(A)(1)(b) |
| COUNT 5 | FELONIOUS ASSAULT | R.C. 2903.119(A)(1) |
| COUNT 6 | ENDANGERING CHILDREN | R.C. 2919.22(A) |
| COUNT 7 | RAPE | R.C. 2907.02(A)(2) |
| COUNT 8 | RAPE | R.C. 2907.02(A)(2) |
| COUNT 9 | RAPE | R.C. 2907.02(A)(2) |
| COUNT 10 | RAPE | R.C. 2907.02(A)(2) |
| COUNT 11 | GSI | R.C. 2907.05(A)(1) |
| COUNT 12 | ABDUCTION | R.C. 2907.02(A)(2) |
| COUNT 13 | ENDANGERING CHILDREN | R.C. 2919.22(B)(3) |

{¶ 9} On June 1, 2022, the case proceeded to trial. The jury heard from Norris, Detective Miller, the victim's aunt, Dr. Jonathon Thackeray, Officer Taylor, and the victim, who testified as a court's witness. After approximately two and a half hours of deliberation,

the jury returned guilty verdicts on Counts 1-4 and 7-13. Alfrey was found not guilty on the felonious assault and endangering children charges in Counts 5 and 6. On July 13, 2022, after ordering a presentence investigation, the trial court imposed an aggregate sentence of 40 years to life in prison.

{¶ 10} At an unknown date in the spring of 2023 (after Alfrey had filed his brief but before the State's brief was due), Alfrey died while in prison and, on March 23, 2023, the State filed a notice suggesting his death and a motion to substitute appellate counsel as the party/representative in the appeal pursuant to App.R. 29(A). We sustained the State's motion, and Alfrey's appellate counsel has been substituted as the party/representative in this appeal.

## II.    Manifest Weight of the Evidence

{¶ 11} In his lone assignment of error, Alfrey alleges that his convictions were against the manifest weight of the evidence.

{¶ 12} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the

conviction.' " (Emphasis added.) *Id.*

**{¶ 13}** "When engaged in this limited reweighing, the appellate court may not merely substitute its view for that of the trier of fact[.]" *State v. Thompson*, 10th Dist. Franklin No. 16AP-812, 2017-Ohio-8375, ¶ 25. "It is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 35.

**{¶ 14}** At trial, the jury heard from multiple witnesses who all testified that the victim had told them that from May 2020 until August 2021, she had been sexually abused by Alfrey. The jury first heard from Norris, a forensic nurse at Dayton Children's Hospital, who was designated an expert in the field of pediatric physical and sexual abuse. Norris told the jury that on August 30, 2021, she came in contact with the victim, who presented with multiple visible injuries. Norris recounted that she asked the victim why she was at the hospital, to which the victim replied, "because I told them that [Alfrey] had been doing sexual stuff to me since Mother's Day 2020." Trial Tr. at 154. The victim told Norris that there had been vaginal and anal penetration by Alfrey's penis and that she had performed oral sex on him as well. Trial Tr. at 155-157. She further stated that the last time she had been assaulted was August 28, 2021.

**{¶ 15}** Norris also testified that the victim, without prompting, began to tell Norris how she received her injuries. The victim reported that a few days earlier, she had been choked, punched, and stomped on by Alfrey when she threatened to tell. She also had a bruise or contusion on her left breast that she claimed was a hickey. As part of her duties

as a forensic nurse, Norris noted and photographed the injuries to the victim's face, neck, inside of mouth, and breast. She then walked the jury through the photos, which were presented as State's exhibits.

{¶ 16} Exhibits 19-22 focused on the victim's right eye. The photos showed petechiae – busted blood vessels – which can result from being punched, but often from being choked. Norris explained to the jury that it was from "non-fatal strangulation." Exhibits 24-27 show other examples of petechiae: on the roof of the victim's mouth and on her right temple. Norris then showed the jury Exhibits 32-36, pictures depicting bruising and petechiae on the side of the neck. Exhibits 39-43 all showed linear curvature petechiae on the front of the neck. According to Norris, all these injuries support the claim that the victim was choked or strangled by Alfrey.

{¶ 17} More injuries to the victim were depicted by Exhibits 44-49. These pictures showed open wounds inside her mouth – on her top and bottom lips – which likely resulted from being punched in the mouth. Exhibits 53-59 showed linear bruising on the victim's right arm, more evidence that Alfrey had beat her. Finally, Norris showed the jury pictures of a contusion/bruising on the victim's left breast (Exhibits 50-52). According to the nurse, this was a suction wound, supporting the allegation that it was a hickey caused by Alfrey.

{¶ 18} Norris also testified that she performed sexual assault tests but could find no physical evidence or injuries. That result, though, according to the nurse, was not unexpected or uncommon for several reasons. First, the victim was on her period and was actively bleeding, which would have washed away any potential bodily fluids left behind by Alfrey. Second, Norris explained that it was not uncommon not to see any

injuries due to "the way the body is made; it's made to stretch, and I forgot my scrunchie. A lot of times I will show with a scrunchie because of the way it stretches and everything. It stretches and then kind of just goes back." Trial Tr. at 160. She further stated that injuries are usually only found in "the more violent cases, your real violent, violent cases." Trial Tr. at 161.

{¶ 19} Dr. Jonathon Thackeray, a pediatrician at Dayton Children's Hospital who worked on the victim's case, also testified. He went through all the same photos that Norris did and came to the same conclusions: the bruising on the victim's neck was consistent with being choked (Trial Tr. at 186-187), injuries on her lips would be consistent with being punched (Trial Tr. at 187-188), and the bruise on her breast "could be consistent with suction hematoma, or a hickey." Trial Tr. at 190. Dr. Thackeray further noted that injuries to the roof of the victim's mouth could have been caused by oral-genital contact. Trial Tr. at 185.

{¶ 20} In addition to medical professionals, the jury also heard from law enforcement at trial. Officer Taylor testified that he was dispatched to Springfield Regional Medical Center in the early morning hours of August 30, 2021 on report that a 13-year-old had been sexually assaulted. During their conversation, the victim told Office Taylor that the abuse began on Mother's Day 2020 while living at the Ronez apartments. The victim revealed that Alfrey "came into her room, pulled down her pants, got on top of her, and rubbed his genitals across her vaginal area." Trial Tr. at 206. She described various forms of sexual contact and stated that she had not wanted to engage in the behavior, but Alfrey would beat her if she refused. The victim told Officer Taylor that Alfrey had told

her that she had no choice and that she would just have to "suffer through it." Trial Tr. at 210.

{¶ 21} The victim recalled other dates of abuse as well. On June 30, 2021, while living in the Sunset Apartments with Alfrey's girlfriend, Stormie, Alfrey took the victim to the bedroom to perform sexual acts, but this time, Stormie walked into the room while they were kissing. According to the victim, this was also where Alfrey, believing that she was pregnant, punched her stomach until she bled.

{¶ 22} The victim told Officer Taylor that after Stormie walked in on them, they were kicked out of her house, causing them to move again, this time to a house on West Grand Avenue in Springfield. At the new location, the same conduct continued. On the evening of August 28, 2021, Alfrey forced the victim to have intercourse. According to the victim, this was the last straw, and she informed Alfrey that she was done. She told Officer Taylor that, enraged, Alfrey threw her off the bed, beat her, stomped on her face with his work boots on, choked her, and threatened to kill her if she told.

{¶ 23} The next night, the victim ran away to her Aunt Michelle's house. Michelle testified that the victim informed her that Alfrey had been engaging in sexual contact with her for a long period of time. Michelle also told the jury that her niece informed her that when Alfrey was ready to ejaculate, he would do so into a sock so she would not get pregnant. Trial Tr. at 228.

{¶ 24} The State closed its case-in-chief with the testimony of Detective Kevin Miller. He had interviewed Alfrey, and the video of their conversation was played for the jury. The video started with Alfrey denying everything, but after Detective Miller brought

up the sock, Alfrey's demeanor changed; he began crying and acknowledged that the things the victim alleged had in fact happened. And while Alfrey admitted to having sex with the victim on at least two occasions (State's Exhibit 71 at 1:18.15 and 1:20.00) – at the Ronez apartment and at the house on West Grand – he maintained that she was to blame for coming onto him and that "she started everything." He alleged that the initial incident at Ronez began when the victim started touching his leg, and the August incident, he claims, commenced when she brought him back to the bedroom to have sex. When asked if he forced the victim to suck his penis, Alfrey responded: "I didn't force her to do nothin' she didn't wanna do." State's Exhibit 71 at 1:21.35.

{¶ 25} The victim also testified, but as a court's witness. Over the course of her testimony, she recanted all of the accusations she had made against Alfrey, stating that everything she had said was a lie. "I told this lie because I didn't want to live with [Alfrey's girlfriend] Stormie because she always made me get up with her kids and cook and clean, and I felt like that wasn't my job. So, I went to school and asked my friend what to do to not be able to go back there, and she told me. So, I did it, and now it got me in this big ass mess." Trial Tr. at 265. The victim went on to tell the jury that she simply made up the specific details and claimed that her injuries were from wrestling around with her cousins.

{¶ 26} Notwithstanding the evidence against him and his own admissions of guilt, Alfrey argues on appeal, as he did below, that he is not guilty (or in this case, his convictions were against the manifest weight of the evidence) because the victim recanted at trial, claiming everything she had previously told everyone was a lie. While the jury heard her (new) side of the story, that does not mean the verdicts were against

the manifest weight of the evidence. The trier of fact is in the best position to consider inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Petty*, 10th Dist. Franklin Nos. 11AP-716, 11AP-766, 2012-Ohio-2989, ¶ 38, citing *State v. Williams*, 10th Dist. Franklin No. 02AP-35, 2002-Ohio-4503, ¶ 58. "To that end, the fact finder is free to believe all, part or none of the testimony of each witness appearing before it." *Id.*, citing *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21. In this case, it is clear that the jury did not find the victim's recantation to be credible, especially in light of the fact that she had consistently told everyone the same detailed account of abuse, her injuries matched her accusations, and Alfrey was on tape admitting that he had had sex with her.

{¶ 27} We conclude that Alfrey's convictions for rape in Counts 1-4 and 7-10, GSI in Count 11, and child endangering in Count 13 were not against the manifest weight of the evidence.  As to those convictions, the assignment of error is overruled. His conviction for abduction in Count 12, however, was against the manifest weight of the evidence.

{¶ 28} At trial, the State, presented no evidence that Alfrey had abducted the victim. To be guilty of abduction under R.C. 2905.02(A)(2), a person must knowingly, by force or threat, restrain the liberty of another under circumstances that create a risk of physical harm or place the victim in fear. In its brief, the State argues that this was demonstrated when Alfrey beat up the victim when she threatened to report the abuse, but we see that incident as an assault or, as charged in Count 13, endangering children, not a restraint on the victim's liberty. By following the State's logic, virtually any serious

assault in which the victim suffers injuries could then be charged as abduction. Further, in this case, there was no evidence the victim's liberty was restrained. She did not state that she tried to leave and was prevented from doing so. Her statement was that she said she was going to tell, Alfrey got mad, and he assaulted her. Because there was no evidence to support the conclusion that the victim's liberty was restrained, Alfrey's conviction for abduction was based on insufficient evidence and was, therefore, necessarily against the manifest weight of the evidence. *See State v. Spears*, 2008-Ohio-5181, 899 N.E.2d 188, ¶ 24 (2d Dist.). As to Count 12, the assignment of error is sustained.

### III.     Conclusion

**{¶ 29}** Having found that Alfrey's conviction for abduction in Count 12 was against the manifest weight of the evidence, the judgment of the trial court will be vacated as to that count. We note that under normal circumstances, we would remand Count 12 for a new trial, but in this unique case, because Alfrey is deceased, it is appropriate to simply vacate that conviction. His convictions for rape in Counts 1-4 and 7-10, GSI in Count 11, and child endangering in Count 13 were not against the manifest weight of the evidence, and the judgment of the trial court will be affirmed as to those convictions.

. . . . . . . . . . . . .

WELBAUM, P.J., and TUCKER, J., concur.